Frances G. Hsiang, Individually and Estate of Ve-Shuen Hsiang, Deceased, Frances G. Hsiang, Voluntary Administratrix v. Commissioner.
Frances G. Hsiang v. Commissioner
Docket No. 84930.
United States Tax Court
T.C. Memo 1964-19; 1964 Tax Ct. Memo LEXIS 313; 23 T.C.M. (CCH) 95; T.C.M. (RIA) 64019; January 30, 1964
*313 Warren Woods, for the petitioners. John W. Holt, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1955 in the amount of $41,502.23. The issues for decision are: (1) Whether petitioners are entitled to a had debt deduction in 1955 of $3,000 as a result of a loan which Ve-Shuen Hsiang had made to a person who was engaged in business in New York, New York as Madame Lee-Sun, becoming worthless in that year. (2) Whether petitioners failed to include taxable income in the amount of $262 received by Ve-Shuen Hsiang from Las Vegas Firestone Dealer, Inc. [1]
(3) Whether petitioners received taxable income in the year 1955 in the amount of $80,000 or any portion thereof from the cashing of a United States Treasury bill. Findings of Fact Some of the facts have been stipulated and are found accordingly. Ve-Shuen Hsiang and Frances G. Hsiang during the year 1955 were husband *314 and wife residing in Boulder City, Nevada. They filed a joint Federal income tax return for the calendar year 1955 with the district director of internal revenue at Reno, Nevada. Ve-Shuen Hsiang (hereinafter referred to as Hsiang) was killed in an automobile accident on September 15, 1961. The payroll records of Las Vegas Firestone Dealer, Inc., for the year 1955 show that Hsiang received earnings of $1,500 in that year, and, in addition, was issued a check in the amount of $262 which was charged to an account of that corporation denominated "Salaries and Wages." In November 1951, Hsiang made a loan in the amount of $3,000 to Pearl Shen doing business as Madame Lee-Sun. Under date of February 23, 1955, Pearl Shen addressed a letter to Hsiang in which she promised to send him whatever she could in the near future. Pearl Shen is not related to Hsiang. Beginning in 1952 Hsiang made continual requests to Pearl Shen to repay the $3,000 to him as she had promised to do. She always gave some excuse for being unable to do so. In February 1956 Pearl Shen left the United States without repaying Hsiang, and Hsiang received no word from her after she left this country. Hsiang graduated *315 from college in China in 1933 with a Degree of Mechanical Engineer, and thereafter attended a university in Turin, Italy under a Chinese Government subsidy. He completed his course of study at the university in Italy in 1937 and received the Degree of Aeronautical Engineer. Upon completion of his studies in Italy Hsiang returned to China and became president of an aircraft factory owned by the government. In 1944 Hsiang came to the United States as a lieutenant colonel in the Chinese Air Force, assigned to work on a plan for postwar aviation industries in China. He continued in this work until January 1, 1948, when he was assigned to serve as executive officer or executive director of the Chinese Air Force headquarters office in Washington, D.C. Shortly after his assignment to this position he was promoted to the rank of colonel in the Chinese Air Force. At the time Hsiang was assigned to duty as executive officer of the Chinese Air Force office in Washington, D.C., that office was in charge of Pang-Tsu Mow (hereinafter referred to as Mow), a lieutenant general in the Chinese Air Force. Mow had been director of the Chinese Air Force headquarters office in Washington, D.C. since *316 March 1943. Mow was Hsiang's immediate superior and Hsiang was the next ranking officer in Washington, D.C. to Mow. There were a number of other Chinese Air Force officers assigned to the Chinese Air Force office in Washington, D.C. The principal mission of the Chinese Air Force office in Washington, D.C. was the procurement of airplanes and supplies for the Chinese Air Force, at first for delivery to the Republic of China on the mainland of China and later to the Republic of China on Formosa. Mow as director of the Chinese Air Force office in Washington, D.C. was entrusted with substantial sums of money by the Republic of China which were kept on deposit at various banks. On May 1, 1951, a telegram was transmitted to Mow by the Chinese Embassy in Washington, D.C., notifying him that the Chinese Air Force office in Washington, D.C. had been abolished, effective April 30, 1951, and ordering him to pay over and transfer to a new governmental agency the funds and records of the Chinese Air Force office in Washington, D.C. Mow refused to comply with this direction. On August 21, 1951, a cable was sent from the Commanding General of the Chinese Air Force in China to the Chinese Ambassador *317 in Washington, D.C., which stated: Please communicate the following to Colonel V. S. Hsiang: You are charged with corruption and dereliction of duties and under suspicion of working for the Communists. You are hereby dismissed from your official duties and are ordered to return to China immediately to await prosecution. You are instructed by this cable to act according to this order. Mow was suspended from all duties including that of director of the Chinese Air Force office in Washington, D.C. as of August 21, 1951, and ordered to return to Formosa and answer charges of dereliction of duty and corruption. At the same time Mow was ordered to turn over to a specified representative of the Republic of China all records and monies of the Chinese Air Force under his control. Neither Hsiang nor Mow obeyed the orders of August 21, 1951. On November 14, 1951, the Republic of China as plaintiff filed a complaint in the United States District Court for the District of Columbia (hereinafter referred to as the District Court) against Mow and Hsiang, asking for an accounting of Chinese Government monies entrusted to or placed under the control of Mow and Hsiang, and seeking to compel Mow *318 and Hsiang to surrender and pay over to the Chinese Government any and all monies not properly expended and to deliver to the Chinese Government an books, papers, documents, records, and equipment of the Chinese Air Force office in Washington, D.C. The complaint also asked for a temporary restraining order and a preliminary injunction restraining and enjoining Mow and Hsiang from expending, transferring, or otherwise disposing of any money of the Chinese Government and from removing, destroying or otherwise disposing of any of the books, papers, documents, records, or equipment of the Chinese Air Force office. Such a temporary restraining order was issued by the District Court on November 14, 1951, and a preliminary injunction was issued on December 10, 1951. The temporary injunction remained in force until the case was settled and judgment was filed pursuant to such settlement on September 17, 1959. Appropriate notice was given to Mow for the taking of a deposition on February 8, 1952, in the case brought against him by the Republic of China. Mow did not appear for the taking of the deposition. He crossed the United States border into Mexico in January 1952. The Republic of China *319 moved to strike Mow's pleadings and for judgment by default, and on February 25, 1952, the District Court entered an order granting the Republic of China's motion unless Mow appeared and gave his deposition by March 3, 1952. Mow continued to refuse to appear, and judgment was entered on March 3, 1952, striking his pleadings, directing him to account for and turn over to the Republic of China all of its monies, properties, and records, and referring the case to the District Court Auditor. Pursuant to that order the District Court Auditor held a number of hearings for the presentation of testimony and the receipt of evidence. Mow made no accounting as ordered by the District Court and did not appear in person before the auditor. He was represented at the hearings before the anditor by counsel who cross-examined the witnesses of the Republic of China and presented evidence on Mow's behalf. On April 14, 1954, the auditor filed his report finding that the Republic of China was entitled to judgment against Mow in the amount of $6,368,503.47 plus interest and costs. Exceptions to the auditor's report were filed on behalf of Mow and on June 1, 1954, the District Court ratified and continued *320 the report of the auditor and entered judgment against Mow in the amount of $6,368,503.47 plus interest and costs. This judgment was affirmed upon appeal to the United States Circuit Court of Appeals for the District of Columbia. The judgment against Mow in the amount of $6,368,503.47 represented the unaccounted for balance of Chinese Government funds which had been entrusted to Mow. The order provided that to the extent certain assets consisting of bank deposits and other items which the District Court order dated March 3, 1952, had directed Mow to pay over and surrender to the Republic of China had been recovered or received by the Republic of China, they should be credited upon the judgment entered against Mow. Among the items listed was the following: United States Treasury bearer bills bought by Mow with plaintiff's [Republic of China] funds or the proceeds thereof, with accrued interest, and having the following serial numbers: No. 514,819
$1,000,000
95,060
500,000
931,958
100,000
931,959
100,000
931,960
100,000
931,961
100,000
931,677
100,000
$2,000.000 The report of the auditor recited that these Treasury bills had been purchased by Mow *321 on November 16, 1951 with Chinese Government funds which had been advanced to Mow and deposited by him in an account in his name in the National Bank of Washington and that they were the property of the Republic of China. In 1957 a settlement agreement was negotiated between Mow and the Republic of China. This agreement provided in part that Mow would release funds under his personal control to the Republic of China including a number of the Treasury bills Mow had purchased on November 16, 1951, and that the Republic of China would deliver the amount of $130,000 to Mow. In 1959 an in-court settlement of the case filed by the Republic of China against Hsiang in the District Court was negotiated. This settlement was filed along with a consent decree which was entered on September 17, 1959. The settlement provided that Hsiang would release to the Republic of China funds under his personal control and would in turn receive from the Republic of China approximately one-third of those funds, or a total payment of approximately $45,372.66. The consent decree specifically provided that this judgment was not to be considered as a finding of fact. During the course of the District Court *322 case numerous depositions were taken in an effort to trace the disposition made of certain funds which had been entrusted to Mow. Several depositions of Hsiang were taken. Hsiang was also involved in a deportation proceeding and certain other actions or proceedings. The parties in the instant case have agreed that certain depositions, affidavits and answers to interrogatories of Hsiang and of other individuals taken in connection with these cases or proceedings shall be received in evidence in the instant case as if they had been taken for the purpose of this case. On February 26, 1953, Hsiang received $50,000 from Credit Suisse, a bank in Switzerland. During 1951 and 1952 Mow had transferred funds belonging to the Republic of China to this bank. The $50,000 received by Hsiang from this bank on February 26, 1953, was deposited by Hsiang in an account in the First National Bank of Nevada, Las Vegas Branch, which he had opened under the fictitious name of Walter Z. Smith. On November 18, 1953, Hsiang received $40,000 by check from Credit Suisse, which he endorsed to the order of some Las Vegas attorneys. These attorneys deposited this check in their trust account. On November 24, 1954, Hsiang *323 was remitted by order of Credit Suisse $166,165.76 through the Bank of America National Trust & Savings Association, Los Angeles, Main Office. Hsiang drew checks on his account in the Bank of America National Trust & Savings Association in which he had deposited the $166,165.76 received from Credit Suisse for a personal investment in a business in Las Vegas and for brokerage accounts opened in his own name. In February or March 1955, Mow sent Treasury bill No. 931,960 for $100,000 to Hsiang for cashing. Mow sent this bill by messenger who delivered it at the Los Angeles airport. Hsiang had arranged with an associate of his in business in Las Vegas named Ernest Amante to have this Treasury bill cashed. Hsiang opened the envelope which had been brought to Los Angeles by Mow's messenger in Amante's presence. This envelope contained Treasury bill No. 931,960. Hsiang delivered the bill to Amante with instructions to take it to a William E. Decker (hereinafter referred to as Decker) for cashing. Amante had previously arranged through two men (Tony D'Andrea and S. C. Schneider) for Decker to cash the Treasury bill. Decker presented United States Treasury bill No. 931,960 to the Harris Trust *324 & Savings Bank, Chicago, Illinois on March 31, 1955, and on the same day this Treasury bill was presented by that bank to the Federal Reserve Bank of Chicago for collection. The proceeds of Treasury bill No. 931,960 Savings Association in which he had deposited the $166,165.76 received from Credit Suisse for a personal investment in a business in Las Vegas and for brokerage accounts opened in his own name. In February or March 1955, Mow sent Treasury bill No. 931,960 for $100,000 to Hsiang for cashing. Mow sent this bill by messenger who delivered it at the Los Angeles airport. Hsiang had arranged with an associate of his in business in Las Vegas named Ernest Amante to have this Treasury bill cashed. Hsiang opened the envelope which had been brought to Los Angeles by Mow's messenger in Amante's presence. This envelope contained Treasury bill No. 931,960. Hsiang delivered the bill to Amante with instructions to take it to a William E. Decker (hereinafter referred to as Decker) for cashing. Amante had previously arranged through two men (Tony D'Andrea and S. C. Schneider) for Decker to cash the Treasury bill. Decker presented United States Treasury bill No. 931,960 to the Harris Trust *325 & Savings Bank, Chicago, Illinois on March 31, 1955, and on the same day this Treasury bill was presented by that bank to the Federal Reserve Bank of Chicago for collection. The proceeds of Treasury bill No. 931,960 were paid by the Federal Reserve Bank of Chicago to Harris Trust & Savings Bank by credit to its account on April 1, 1955. The proceeds of the bill were credited to the account of Decker & Company on the books of the Harris Trust & Savings Bank on April 1, 1955. The balance in that account immediately following such credit was $100,191.67. Shortly after April 1, 1955, attempts were made to cash other of the Treasury bills which Mow had purchased on November 16, 1951, but payment was refused by the Federal Reserve Bank because of the District Court injunction. On April 1, 1955, a withdrawal was made in the amount of $85,000 from the account of Decker & Company with the Harris Trust & Savings Bank in currency in the denomination of $1,000 bills. The amount was paid directly to Decker. On April 1, 1955, $10,000 was withdrawn from the account of Decker & Company with Harris Trust & Savings Bank, and on this same day an account was opened with that bank by Decker denominated *326 "William E. Decker, Special Account," and the $10,000 credited thereto. On April 1, 1955, Decker drew a check for $5,000 on that special account payable to S. C. Schneider. On April 1, 1955, Schneider delivered $85,000 in $1,000 bills to Amante and Amante gave D'Andrea $5,000. Amante then delivered seventy $1,000 bills to Hsiang. Hsiang notified Mow that he had been successful in cashing the Treasury bill for $100,000 and asked Mow to send a messenger to pick up the cash. Mow sent a messenger to meet Hsiang in Los Angeles, and Hsiang delivered an envelope to the messenger containing cash in denominations of $100, $500 and $1,000 bills. Mow had told Hsiang that he could keep $10,000 of the amount received from cashing the Treasury bill, but Hsiang kept more than the $10,000 which Mow had told him to keep. On Monday April 4, 1955, Hsiang deposited $2,000 in $1,000 bills in the Bank of Nevada, Las Vegas, Nevada and $14,000 in cash in the Silver State Savings & Loan Association in Las Vegas, Nevada in unidentified denominations. On April 6, Hsiang purchased some stock for $19,750 through a brokerage firm in Los Angeles, and on April 7, he made a cash deposit of $1,000 in his Bank of *327 America account in Los Angeles, California. On April 19, he deposited $11,000 in $1,000 bills in his bank account at the Bank of Nevada. Respondent in his notice of deficiency disallowed the $1,500 capital loss claimed by petitioners because of a nonbusiness bad debt resulting from a $3,000 loan made by Hsiang to Madame Lee-Sun, and increased petitioners' income by $212 as additional salary to Hsiang from Las Vegas Firestone Dealer, Inc. He also increased petitioners' reported income by the amount of $80,000 which he explained was income which Hsiang received on the cashing of Treasury hill No. 931,960 during the calendar year 1955 and failed to report. Ultimate Facts Petitioners have failed to establish that the $3,000 loan made by Hsiang to Madame Lee-Sun became worthless in the year 1955, and that Hsiang did not receive additional income in the amount of $212 from Las Vegas Firestone Dealer, Inc. Petitioners in the year 1955 received income of $50,000 from the cashing of United States Treasury bill No. 931,960, which they failed to include in their taxable income as reported. Opinion The first issue is whether an advance by Hsiang of $3,000 to Madame Lee-Sun constituted *328 a debt which became worthless in 1955. Respondent does not concede that the advance of $3,000 by Hsiang to Madame Lee-Sun was a loan to her. On the basis of the evidence we have found that Hsiang did lend $3,000 to Madame Lee-Sun in 1951. The only evidence in the record bearing on the question of whether this debt became worthless in 1955 is that from 1952 Hsiang requested repayment on numerous occasions, that in 1955 Madame Lee-Sun (Pearl Shen) wrote Hsiang to the effect that she would send him whatever she could in the near future and that she left the country in 1956. This evidence is far too meager to determine either that the debt had not become worthless prior to the beginning of 1955, or if it did have value at the beginning of 1955 that it had become worthless by the end of that year. We sustain respondent in his disallowance of the capital loss claimed by petitioners because of the claimed worthlessness of this debt. The evidence with respect to the $212 by which respondent increased Hsiang's 1955 income with the explanation that it represented additional salary is even more meager than with respect to the $3,000 loan. All the evidence shows is that in addition to $1,500 *329 paid by Las Vegas Firestone Dealer, Inc., to Hsiang in 1955 as salary from which social security and income taxes were withheld, that company also issued a check to Hsiang on January 5, 1955, in the amount of $262 which was charged to an account of that corporation denominated "Salary and Wages." Hsiang reported that he received only $1,500 as earnings from Las Vegas Firestone Dealer, Inc. Why respondent in his notice of deficiency increased these earnings by $212 instead of $262 has not been explained. In his brief respondent argues that Hsiang should be required to include an additional $262 in his 1955 income as the receipt of salary and wages from Las Vegas Firestone Dealer, Inc. The evidence is totally insufficient to show any error in respondent's determination that petitioner's income should be increased by the amount of $212 as additional salary, and we, therefore, sustain this adjustment made by respondent in his notice of deficiency. However, the evidence is also insufficient to show that the additional $50 which respondent argues should be included in petitioners' taxable income in 1955 was in fact income to Hsiang. Petitioners in their argument contend that the entire *330 $262 represented a reimbursement to Hsiang for an amount he had paid out on behalf of the Las Vegas Firestone Dealer, Inc. It may well be that the reason respondent only increased petitioners' income from salaries to the extent of $212 was that he determined the extra $50 to constitute reimbursement even though entered on the books of Las Vegas Firestone Dealer, Inc., in an account denominated, "Salaries and Wages." There is no evidence in the record to support petitioners' argument that the $262 was reimbursement to Hsiang for an amount he paid out on behalf of Las Vegas Firestone Dealer, Inc. Petitioners do not contend that the record does contain such evidence but ask that we accept the allegation in the petition to this effect in lieu of evidence. The allegation in the petition is denied in respondent's answer and therefore cannot be accepted as a proven fact in this case. The primary issue in this case is whether petitioners' income should be increased by $80,000 or any portion thereof because of income received by Hsiang upon the cashing of Treasury bill No. 931,960. It is respondent's position that in 1955 Hsiang received the $80,000 and that under the decisions of the Supreme *331 Court in Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955) and James v. United States, 366 U.S. 213 (1961), this amount constitutes income to him. Petitioners take the position that Hsiang did not receive any of the proceeds from the cashing of Treasury bill No. 931,960 in 1955 or in any other year. We have found as a fact that Amante delivered $70,000 of the proceeds from the cashing of Treasury bill No. 931,960 to Hsiang in $1,000 bills and that Hsiang delivered to Mow through a messenger a portion of this $70,000. We recognize that Amante said that after delivering the $70,000 to Hsiang, he delivered to him an additional $10,000. We have not so found. From all the evidence we have concluded that this statement of Amante's is not worthly of belief. We have also found that when Mow sent the Treasury bill to Hsiang to be cashed, he expected Hsiang to retain $10,000 and send the balance of what he received from the cashing of the Treasury bill to him. At the time in 1955 when this Treasury bill was cashed, a judgment of the District Court determining that the money with which this Treasury bill was purchased was the property of the Republic of China *332 and that therefore the Treasury bill properly belonged to the Republic of China had been entered. However, the record does show that Mow was still attempting to keep Treasury bill No. 931,960 as his own property at the time it was cashed and that this Treasury bill was sent by Mow to Hsiang to be cashed and the proceeds, except for $10,000, returned to him. Leaving aside the rights of the Republic of China to Treasury bill No. 931,960, the proceeds thereof in excess of $10,000 were received by Hsiang to be returned to Mow and not as his own property. Under these circumstances to the extent that Hsiang did return the proceeds to Mow, it does not appear that Hsiang could be charged with income from the cashing of the Treasury bill either under the cases cited by respondent or any other cases to which our attention has been directed. The evidence in this case shows that except to the extent of $10,000 it was Mow's intention that Hsiang act as his agent or trustee to transmit the proceeds of the Treasury bill to him. On weighing the evidence we have accepted the testimony of Mow with respect to the cashing of the Treasury bill. Mow's deposition was taken in Mexico after he had finally *333 settled the case brought against him by the Republic of China. At that time there was no personal benefit which Mow could obtain by misrepresenting the facts. His testimony in this deposition did not disclose any malice toward Hsiang. However, Mow did not state the amount of cash which Hsiang sent to him and we have made this determination from other evidence. The record in this case is voluminous and contains evidence with respect to various checks which Mow caused to be drawn on Credit Suisse in favor of various individuals and delivered to Hsiang, delivery by Mow of another one of the Treasury bills to attorneys he had engaged to defend the suit against him in the District Court and subsequent claim against these attorneys by the Republic of China, various financial transactions of Hsiang, and of Hsiang's activities in the United States on behalf of Mow while Mow was in Mexico and his communications with Mow. It also shows that Hsiang in defense of the District Court case brought by the Republic of China against him insisted that the proper authorities in the Republic of China had not issued the order dismissing him from his position and directing him to return to China and that *334 Hsiang explained all of the various monies which he received and could not otherwise account for as having been sent to him from China for safekeeping by his father and his father's family. The record also shows that even though Hsiang admitted having received monies from Mow for safekeeping, all of which monies he insisted he returned to Mow, he denied consistently in his numerous depositions any knowledge with respect to the cashing of Treasury bill No. 931,960 of with respect to any transaction in regard to the other Treasury bills which Mow had purchased on November 16, 1951, except newspaper articles which he read or statements made to him by others. The testimony given by Hsiang in the various depositions is not only confusing but at times his statements are directly contradictory of his previous sworn statements. His testimony with respect to the Treasury bill is directly contradicted by a letter he wrote on February 1, 1955, to an American Army officer who was a friend of his and who at the time the letter was written was stationed in England. This letter dealt with the possibility of cashing one of the United States Treasury bills in England. We have made no effort in *335 our findings to recite all of the various transactions which are covered in the record in this case. Much of the testimony taken by depositions otherwise account for as having been sent to him from China for safekeeping by his father and his father's family. The record also shows that even though Hsiang admitted having received monies from Mow for safekeeping, all of which monies he insisted he returned to Mow, he denied consistently in his numerous depositions any knowledge with respect to the cashing of Treasury bill No. 931,960 of with respect to any transaction in regard to the other Treasury bills which Mow had purchased on November 16, 1951, except newspaper articles which he read or statements made to him by others. The testimony given by Hsiang in the various depositions is not only confusing but at times his statements are directly contradictory of his previous sworn statements. His testimony with respect to the Treasury bill is directly contradicted by a letter he wrote on February 1, 1955, to an American Army officer who was a friend of his and who at the time the letter was written was stationed in England. This letter dealt with the possibility of cashing one of the *336 United States Treasury bills in England. We have made no effort in our findings to recite all of the various transactions which are covered in the record in this case. Much of the testimony taken by depositions otherwise account for as having been sent to him from China for safekeeping by his father and his father's family. The record also shows that even though Hsiang admitted having received monies from Mow for safekeeping, all of which monies he insisted he returned to Mow, he denied consistently in his numerous depositions any knowledge with respect to the cashing of Treasury bill No. 931,960 of with respect to any transaction in regard to the other Treasury bills which Mow had purchased on November 16, 1951, except newspaper articles which he read or statements made to him by others. The testimony given by Hsiang in the various depositions is not only confusing but at times his statements are directly contradictory of his previous sworn statements. His testimony with respect to the Treasury bill is directly contradicted by a letter he wrote on February 1, 1955, to an American Army officer who was a friend of his and who at the time the letter was written was stationed in England. *337 This letter dealt with the possibility of cashing one of the United States Treasury bills in England. We have made no effort in our findings to recite all of the various transactions which are covered in the record in this case. Much of the testimony taken by depositions and interrogatories in the various Court cases and other proceedings which has been placed in this record by stipulation is totally immaterial to the issue here involved. We have, however, considered all the evidence that we consider material and have considered the testimony of the various deponents and affiants with respect to all matters even though not material to the issue here to arrive at a judgment of the reliance to be placed on their testimony to the extent material to the issue here. We have sifted the testimony to attempt to tie in various aspects of it and in so doing have concluded that Hsiang's testimony with respect to receiving two packets of money from Mow for safekeeping around the first of April 1955 and returning a portion of that money by messenger to Mow but investing the balance to hold for Mow until a later date ties in with the testimony of Mow with respect to sending the Treasury bill to *338 Hsiang for cashing and receiving back a portion of the proceeds from the cashing of the bill and the testimony of Amante with respect to delivering the proceeds of the bill to Mow. [2] The evidence that from April 4 to 19, 1955, Hsiang made bank deposits and bought stock in a total amount of $47,750 and some of the deposits were of $1,000 bills, ties in with the testimony of Amante of the delivery to Hsiang of $1,000 bills. *339 We are aware that Hsiang stated that he had returned more money to Mow than the total amounts turned over by Mow to him for safekeeping. Upon consideration of all of Hsiang's testimony, we are unwilling to rely on any portion thereof other than his admission of receipt of funds, except to the extent that it is in some way corroborated by other evidence in the record. His testimony was colored by his own interpretation of the actions of officials of the Chinese Government and by his fear that he might admit to some action which might be considered illegal. In any event Hsiang in his own testimony is never certain that during the year 1955 he returned to Mow all funds he received from Mow in that year. He, in effect, admits that at the end of 1955 he was using funds received from Mow during 1955 for his own purposes. There is no evidence that any funds which Hsiang received from Mow in 1955, whether by way of receipts from the cashing of the Treasury bill or otherwise were a loan or gift. There is no evidence of any such amounts being held by Hsiang in a trustee account but what evidence there is shows that these funds were deposited in Hsiang's own bank accounts or invested in stocks *340 bought in his own name. There is no persuasive evidence to show that during or at the end of 1955 Hsiang was holding such funds as other than his own. Cf. James v. Commissioner, supra. On the basis of the record as a whole we sustain respondent in his increase of petitioners' income because of receipts from cashing of United States Treasury bill No. 931,960 to the extent of $50,000. Decision will be entered under Rule 50. Footnotes
1. The amount discussed by the parties is $262 although the respondent in the notice of deficiency increased petitioners' reported income for additional salary by only $212.↩
2. Q. How did you receive the money from General Mow around about this time? [April 1, 1955] A. I can vaguely remember delivery to my place where I was working. Q. Was that at the Las Vegas Firestone deater? A. Yes. But at that time there were two packages, one delivered to my home, one delivered to my working place, and the instruction just the same, for safekeeping, I could not have any idea which I received there, because both not marked by postage at all, in other words, not mailed, but delivered. Q. And did one of these packages contain the money that you have just indicated you received from Mow? A. Yes. Q. How much money? A. I didn't count it. * * *
Q. You have referred to two packages which were delivered to you, one in your home and one in your store, around March 1955. Did both of those packages come from General Mow? A. As instructions, yes, Mr. Mow's instructions in them. Q. Did the package come from Mexico? A. No postage whatsoever. I don't know where it come from I have no way to find out where it came from. Q. Don't you think it is quite likely that the money came from some place in the United States? A. Anything possible anywhere possible. I have no way to say one way or other. Q. Now, you have told me about one package of money which you gave to the messenger with the understanding that he would deliver it to Mow. Was there another package containing money which you sent to Mow? A. Later. * * *
Q. From the instructions which you received from Mow, or any information which you received from any other person did you have any idea as to the source of the money that you gave to the messenger for delivery to General Mow? A. I never once had a definite idea where the money came from, but I read the newspapers and I talked to Dr. Cha, whom I met, that is all - the information I had heard, - but not from Mow source. Q. Are you meaning to indicate that it is possible that the money that you gave to the messenger for General Mow was derived from one of the Treasury Bills? A. I didn't have the slightest idea at that time. Q. Do you have any idea now? A. Referring to what I heard in the newspaper but I can not take the words of the newspaper. (Above from deposition of Ve-Shuen Hsiang, dated February 1, 1956. in District Court case of Republic of China against Mow and Hsiang. Exhibit No. 12-L, Vol. 11, in instant ease.] Q. Now what did you receive from General MAO at that time? A. It was a letter. Q. Was there anything in the letter? A. Nothing. Q. Well now - A. Wait a minute. It was a letter asking me a certain kind of package. It was something previously asked me to keep. I gave back to MAO. * * *Q. Well now, when did you get this $40,000? A. I didn't remember but I'm sure that would be along Easter of 1955. Q. Well, you told Mr. JACOBSON it was early in April of 1955. That would have been within two months after the incident took place your memory would probably have been rather fresh at that time. A. Now in that time when I was subpoenaed or summoned by that man I didn't even have the slightest idea about what - so in that time -. * * *Q. Well now, what did you do with this $40,000? A. For safekeeping and all that lot of cash, not good. So I thought it will be much better to buy some security to put aside instead of keeping cash. Q. Who did you buy the securities through? A. Brokerage here. * * *
Q. Was the investment made through the First California Company? A. Yes, that's right. Q. How long did you leave the money invested in those stocks? A. For a year or so. Q. Then you sold the stock - just a minute. Now this investment was made in your name is that correct? A. In mine, yes. Q. And then after a year or so you sold the stock. What did you do with the money then? A. The money gradually all back to General MAO. Q. Do you have any evidence of having sent it to General MAO? A. Some, yes, but not all of them because many of them cashed under his instructions. According to his instructions, yes. Q. Well now, this business, this $40,000 was received it was received early in April of 1955, it must have been because the purchase of stocks were made some of them on the 5th of April I believe. A. Yes, that is the indication of the date. I couldn't remember, Mr. Moore. I do not intend not to tell because that is a open record, you see. Q. Well do you recall that on April 1, 1955, that $100,000 bill was cashed in Chicago, the $100,000 bill that was sent from Mexico by General MAO? Do you remember that? A. I didn't know until the first news brought up to me was the Minister CHA. I met him in Los Angeles. That's the first news brought out to me about the whole thing. [Above from Record of Sworn Statement by Ve-Shuen Hslang before Investigator of Immigration and Naturalization Service, San Francisco, California, November 15, 1957. Ex. 23-W in instant case.]↩